HANSEN et al. v. UNIFORM SEAMLESS WIRE CO.

(District Court, D. Rhode Island.   September 9, 1916.)

No. 1585.

CORPORATIONS ⊚➾308(5)—CONTRACTS WITH OWNER OF CONTROLLING STOCK—
VALIDITY.

On the organization of a corporation, all of its common stock, except
3 shares, of a par value of $30, were issued to petitioner in payment for
certain formulæ and inventions, and he became president and a director.
The corporation also entered into a contract by which it employed him
as general manager for 10 years at a weekly salary of $100.   During the
ensuing 6 years preferred stock was sold, but purchasers were not in-
formed of the contract, nor was the stipulated salary paid petitioner,
although he drew smaller sums from time to time for services.   State-
ments were also issued, for purposes of selling stock and as a basis for
credit, none of which showed any indebtedness to petitioner for past
salary.   Held, that the contract was one in form only, and not enforce-
able as against other stockholders or creditors.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1339, 1340;
Dec. Dig. ⊚➾308(5).]

In Bankruptcy.   Petition in involuntary bankruptcy by Charles E.
Hansen and others against the Uniform Seamless Wire Company.
Petition dismissed.

Peter C. Cannon, of Providence, R. I., for petitioning creditors.
J. Jerome Hahn, of Providence, R. I., for defendant.

BROWN, District Judge.   This is an involuntary petition in bank-
ruptcy.

The principal question is whether the claim of Joseph T. Boland to
be a creditor is established by the evidence.   Boland's claim is set
forth as follows:

(1) Joseph T. Boland, services as general manager of said Uniform
    Seamless Wire Company under a certain contract dated May
    20, 1909, between said Joseph T. Boland and said Uniform Seam-
    less Wire Company.   Balance due.............................$24,855
(2) Also for the reasonable value of work and labor performed by said
    Joseph T. Boland for the said Uniform Seamless Wire Company
    as general manager of said Uniform Seamless Wire Company
    from May 20, 1909, to March 4, 1916.   Amount as above........$24,855

By the records of the board of directors of the Uniform Seam-
less Wire Company, a Maine corporation having its principal place
of business at Providence, R. I., it appears that on October 27, 1908,
it was voted that the corporation purchase of Boland, for the sum
of $99,970, payable wholly and only by 9,997 shares of common cap-
ital stock, certain rules and formulæ relating to the manufacture of
seamless gold plated wire, etc., and also all formulæ, inventions, and
processes, etc., patented or unpatented, which, during the period of
10 years next ensuing, he might have, possess, make, and acquire, re-
lating to metallurgy, metallic plating, etc.

The record of that meeting recites the execution by Boland of a
deed drawn by counsel of the corporation, its delivery to the treas-

urer, and the issue and delivery to Boland of a certificate for 9,997 shares of the common stock. This was all except 3 shares of the capital stock. It was also voted that the corporation make a contract with Wheaton Seabury, Incorporated, to pay a commission of 10 per cent. on all moneys and funds paid to the corporation for stock, common or preferred, sold by Wheaton Seabury, Incorporated. So far as this related to common stock, it was inconsistent with the issue of that stock to Boland, though it indicates that Boland and the corporation were regarded as practically the same in interest.

On February 1, 1909, Boland was elected a director and president in place of Wheaton Seabury, resigned, and also general manager, at a salary of $100 per week, payable weekly, to serve until the next annual meeting, or until some other person was elected and qualified in his stead.

At a meeting of May 14, 1909, it was voted that a contract be made for the term of 10 years from that date, with Boland, to serve as general manager at a salary of $100 per week, payable weekly. This contract was executed May 20, 1909, and is the basis of Boland's claim.

The records show that at this time the corporation was in the first stages of promotion. No moneys had been paid in, and for what he conveyed to the corporation Boland received all of its common stock except 3 shares, of the par value of $10 each.

The record of July 16, 1909, shows the resignation of Wheaton Seabury as treasurer, and a vote to execute to him a general release.

The record of July 30, 1909, shows the election of Elijah Astle as director, treasurer, and secretary. There is no record of any directors' meeting between July 30, 1909, and January 10, 1912. At the latter date it was voted to pay a dividend of 7 per cent. to all holders of preferred stock to December 30, 1911.

The condition of the business for the year ending December 31, 1911, is shown by a report on audit of accounts by Suffern & Sons, certified Public Accountants (Defendant's Exhibit J), which is an important piece of evidence in this case. It shows for the preceding year a total of $2,468.27 for general expenses and salaries, and the schedule of liabilities shows no indebtedness to Boland for past salary.

The contract at the time of its execution was rather a matter of form than of substance, for Boland was in effect merely contracting with himself, since, except for 3 directors' shares, of a par value of $10 each, he owned all the stock in the corporation. As was said of a somewhat similar transaction in Smith v. Bowker-Torrey Co. (D. C.) 207 Fed. 967:

"Looking to the substance of the matter, the agreement between the corporation, all of whose stock was held by the copartners, and the copartners, is primarily a matter of form."

It is claimed that in order to secure the success of the corporation it was essential to secure the services of Boland for a period of 10 years; but the parties to the transaction other than Boland, and the promoter, who was to sell stock for a commission of 10 per cent., had,

so far as appears, no substantial interest in the matter. In effect Boland, having certain formulæ and certain knowledge respecting the manufacture of seamless filled wire, adopted the plan of forming a corporation to which he wou'd convey his formulæ and his inventions, taking all the common stock except 3 shares, and while the owner of practically all the stock, and before marketing any stock, making a contract for 10 years' service. So long as he continued as practically the sole stockholder, it would make little difference whether he received his compensation in the form of salary or of dividends.

A contract for Boland's services for 10 years at a fixed salary of $100 a week might be a valuable asset of the corporation, or a burden, as its affairs might develop. In fixing the amount which the corporation was to pay for services as a general manager and the term of service, however, the value of the services and the term were not fixed between two parties acting in separate and opposing interests, but were fixed arbitrarily. Furthermore, Boland at this time was a director and president of the company.

Under these circumstances purchasers of stock were entitled to be informed of the fact that the company was under obligation to pay Boland the sum of $100 per week for the period of 10 years. It appears, however, that stock was sold to a considerable amount without disclosure to the purchasers of the existence of the contract with Boland.

As the corporation was without funds, and without means of obtaining funds other than the sale of preferred stock, or borrowing, it was from the outset unable to comply with the agreement to pay Boland $100 per week, and its failure to do so gave Boland the liberty of choosing whether he would or would not be bound for the period of 10 years. It was all a one-sided arrangement, lacking in its formation the essential elements of a contract, though it was such in form, and might become such in substance, if subsequently assented to. I find, however, no evidence of subsequent assent to or ratification or recognition of the contract by any person having any substantial interest in the corporation.

I find as a matter of fact, upon the evidence, that the purchasers of the stock did not become informed of the existence of this contract until some time in the spring of 1915. Boland testified that after Elijah Astle had purchased stock, for which he paid, and had been elected treasurer, some time in the latter part of July, 1909, Astle, in looking over the papers of the corporation, found the contract, and said, "This will never do;" and that Boland replied, "Oh, yes; that contract is very good;" and took it and put it into his private drawer in the safe. Boland's own testimony indicates that he did not disclose the existence of the contract to Astle before Astle purchased stock.

Astle, however, denies ever having seen the contract at this time, or that he learned of it before the spring of 1915; and, having regard to the fact that the testimony of Boland is on many points in direct contradiction to that of a number of apparently disinterested wit-

nesses, I find as a fact that Astle and other stockholders were not informed of the existence of this contract before the spring of 1915.

In March or April, 1913, there was some conversation between Boland and Elijah Astle in relation to the amount of salaries, and an informal arrangement was made between them to take preferred stock of the company in satisfaction for salaries, for the years 1909, 1910, and 1911; but this evidence falls short of proof that Astle had knowledge of this contract, or that it was the basis of that arrangement. It shows nothing more than that both Boland and Astle considered that their past services entitled them to compensation from the corporation.

It is significant that the rate of salary for Boland was not $5,200, according to the terms of the contract, but $3,000, per annum.

This plan of taking preferred stock for past salary was not consummated, and the preferred stock, though issued, was returned to the corporation; Boland testifying that he "didn't think it was right to take it, under the conditions."

Upon the whole evidence I find that there was no assent by any party in interest to the contract made by Boland at the organization of the corporation. I find, also, that when Astle and others became purchasers of stock and interested in the business, the affairs were conducted in a somewhat informal way; that from July 30, 1909, when Astle became treasurer, to January 10, 1912, there is no record of any meeting of directors, and that withdrawals for compensation for services were adjusted by Boland and Astle with reference to the ability of the business to pay; that the arrangement for compensating themselves for back salary was not made upon the basis of the terms of an existing contract, nor as a recognition of an existing contract, and for Boland was upon a basis of $3,000, instead of $5,200, a year; and that even this was abandoned on account of the fact that the condition of the business would not warrant it.

The conduct of Boland in his dealings with other stockholders, and in respect to the sale of stock, is entirely inconsistent with the existence of a large claim for salary, and shows that if, at the outset, he planned to collect that amount according to the terms of the contract, he abandoned this plan at a time when it was for his interest to do so in order to secure funds for the company, of which he was always the principal stockholder in interest.

In December, 1911, an audit was prepared and used as a means of inducing investment in the stock. No liability to Boland for past salary appears. Although Boland disclaims a knowledge of other than the mechanical business, the whole testimony shows that he was fully cognizant of the affairs of the company, and that the bookkeepers gave him due information by monthly trial balances. The preponderance of evidence is strongly against Boland on this matter.

Various statements were prepared as a basis of credit at bank, and in these bank statements the item of wage and salary accounts is itemized; but they include no claim of Boland for unpaid salary. Tax returns proper for filing with the state government and the federal government are shown to have been brought to Boland's attention and

none of these returns contains the debt on salary account. It appears that at directors' meetings no claim was advanced by Boland. At certain meetings dividends were declared upon preferred stock. Had Boland's claim been an obligation of the company, it is contended that there would have been no profits with which to pay the dividends. Furthermore, statements were made to creditors as to the standing of the company, which included no claim of Boland for back salary.

The petitioners contend that, if the corporation is not insolvent by virtue of a debt owed under an express contract, it is insolvent by virtue of a debt due upon quantum meruit. I am of the opinion, however, that this case cannot be reopened to admit evidence as to the value of services rendered.

Boland, from time to time by arrangement with the treasurer, received certain sums; and there is no evidence, other than the contract of May 20, 1909, of any express or implied contract of the corporation to pay him any larger sums. Boland, a controlling stockholder, was interested in maintaining the credit of the corporation; and his acceptance of pay from time to time by arrangement with the treasurer must be held conclusive against any claim for a larger amount on quantum meruit.

I am of the opinion that the claim must be disallowed, for the reason that the so-called contract was not a contract in substance, but merely a paper representing a project of Boland, a contract only in form, which was never assented to at any time by any person representing the corporation independently, and for the further reason that Boland upon the evidence must be held both to have abandoned all claims for salary at the contract rate and, by his failure for about six years to assert such claim, and by his knowledge that no indebtedness for the claim was stated as a liability to be fully estopped as against all other stockholders and all creditors from asserting this claim against the corporation as a creditor petitioning the corporation into bankruptcy.

The record of the receivership proceedings in the state court shows that the petition alleged inability to pay debts as they became due in the ordinary course of business, and not that the liabilities exceeded the assets, or insolvency as that term is defined in the Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 544). It therefore is essential for the petitioners to establish the fact of insolvency by proof other than the record of the state court.

The claim of Boland being disallowed, there is a failure to prove insolvency, and the claims of other creditors are insufficient in amount to meet the requirements of the Bankruptcy Act.

The petition is denied.